IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **WINSTON WESLEY NOLES**,<br>*Plaintiff* | § | |
| | § | |
| **v.** | § | Case No. |
| | § | |
| **CHARLES W. GREGORY,**<br>**ROBERT W. McCUMSEY,**<br>**CAMERON M. BECKHAM,**<br>**DERRICK HOCUTT,** and **CITY OF TRINIDAD, TEXAS**,<br>*Defendants*. | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... ii
TABLE OF AUTHORITIES .......... iii
I. INTRODUCTION .......... 1
II. PARTIES .......... 4
III. JURISDICTION AND VENUE .......... 4
IV. FACTUAL ALLEGATIONS .......... 5
V. CLAIMS FOR RELIEF .......... 17
1. 42 U.S.C. § 1983—Fourth Amendment—Unreasonable Seizure (Initial Arrest) 17
2. 42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Prolonged Seizure ... 19
3. 42 U.S.C. § 1983 — First Amendment — Retaliation and Content/Viewpoint Discrimination for Protected Speech .......... 19
4. 42 U.S.C. § 1983—Municipal Liability .......... 22
VI. DAMAGES .......... 26
VII. PRAYER FOR RELIEF .......... 27
VIII. VIII. JURY DEMAND .......... 28

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997) ........ 25
*City of Canton v. Harris*, 489 U.S. 378 (1989) ........ 24
*City of Houston v. Hill*, 482 U.S. 451 (1987 ........ 2, 15, 18
*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ........ 23
*Coggin v. State*, 123 S.W.3d 82 (Tex. App.—Austin 2003) ........ 18
*Cohen v. California*, 403 U.S. 15 (1971) ........ 2, 10, 15, 18
*Connick v. Thompson*, 563 U.S. 51 (2011) ........ 25
*Devenpeck v. Alford*, 543 U.S. 146 (2004) ........ 18
*Gonzalez v. Trevino*, 602 U.S. 653 (2024) ........ 21
*Gooding v. Wilson*, 405 U.S. 518 (1972) ........ 15, 18
*Hartman v. Moore*, 547 U.S. 250 (2006) ........ 21
*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) ........ 20, 21
*Lewis v. City of New Orleans*, 415 U.S. 130 (1974) ........ 2, 10, 18
*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ........ 4
*Nieves v. Bartlett*, 587 U.S. 391 (2019) ........ 21
*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ........ 23
*Ross v. State*, 802 S.W.2d 308 (Tex. App.—Dallas 1990) ........ 18

**Statutes**

28 U.S.C. § 1391(b)(2) ........ 5
28 U.S.C. §§ 1331 ........ 4
42 U.S.C. § 1983 ........ 4
42 U.S.C. § 1988 ........ 27
Tex. Occ. Code § 1701.453 ........ 25
Tex. Penal Code § 38.02 ........ 9
Tex. Penal Code § 42.01(a)(1) ........ passim
Tex. Penal Code § 42.06 ........ 3, 24
Texas Penal Code § 30.06 ........ 7
Texas. 28 U.S.C. § 124(c)(1) ........ 5

**Municipal Ordinances**

Trinidad Code of Ordinances § 32.048 ........ 13, 22, 23

Plaintiff Winston Wesley Noles ("Plaintiff" or "Mr. Noles") files this Original Complaint against Defendants Charles W. Gregory, Robert W. McCumsey, Cameron M. Beckham, Derrick Hocutt, and the City of Trinidad, Texas, and would respectfully show the Court as follows:

## I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983 to redress violations of the First, Fourth, and Fourteenth Amendments. On May 12, 2026, four police officers from three separate municipal police departments converged on Trinidad City Hall in response to a single citizen, Plaintiff Winston Wesley Noles, a citizen journalist known as "Otto the Watchdog," who was standing in front of Trinidad's City Hall holding political signs. Mr. Noles had come to Trinidad to protest a recent state-jail-felony arrest by the Trinidad Police Department of a citizen who had used Facebook to ask other residents about possible water-quality-related health issues, and to question a Texas Penal Code § 30.06 firearm-prohibition sign on the exterior of Trinidad City Hall that did not comply with Texas law.

2. Over approximately twenty minutes—while Mr. Noles peacefully continued his protest, while officers went inside City Hall and returned, while a senior Trinidad officer arrived and broadcast music over his patrol vehicle's loudspeaker, and while officers conferred among themselves—no breach of peace occurred. At the end of those twenty minutes, the officers announced that Mr. Noles was under arrest, placed him in handcuffs, and physically escorted him to the rear of a marked patrol vehicle. He was cited for the words on his signs and for words spoken inside City Hall thirty minutes earlier in a brief conversation with a single City employee.

3. Mr. Noles's signs read, *Back the Blue*, *Fuck Bad Cops*, and *Shit Is Fucked Up And Stuff*. His commentary, broadcast live on the Internet, criticized the Trinidad Police Department's

enforcement actions against critics of local government and the City's handling of the underlying water issues. Each sign and each statement was core protected speech under the First Amendment.

4. Defendant Sergeant McCumsey articulated the asserted elements of the offense as: being in a public place, using profane language, and offending "a citizen that is not a public servant." That recitation omits the "immediate breach of the peace" element of Tex. Penal Code § 42.01(a)(1) entirely and substitutes subjective offense—a standard the Supreme Court has foreclosed for more than half a century. *Cohen v. California*, 403 U.S. 15 (1971); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974); *City of Houston v. Hill*, 482 U.S. 451 (1987).

5. Plaintiff asked whether he could receive a warning if he stopped using the language to which the officers objected. Defendant McCumsey refused: "No. You've already committed that offense."

6. Defendant Officer Beckham directed Defendant McCumsey to handcuff Plaintiff. Defendant Hocutt, a Malakoff Police Department officer responding to Trinidad on a mutual-aid basis, stood immediately behind Plaintiff within arm's reach during the handcuffing and then physically escorted the handcuffed Plaintiff from the public sidewalk to the rear of a marked Trinidad Police Department patrol vehicle.

7. Plaintiff was held in handcuffs in the rear of a patrol vehicle for approximately thirty to forty additional minutes while officers determined what actions to take. Defendant Chief Gregory, who had been at his residence at the time of the seizure, was summoned to the scene. He was briefed. He personally decided that Plaintiff would be released on a citation rather than magistrated. Despite that decision, Plaintiff remained handcuffed in the patrol vehicle for at least an additional twenty minutes while paperwork was completed. He was ultimately issued Citation

No. 36889 for "Disorderly Conduct (Language)," Tex. Penal Code § 42.01, with a court date of May 27, 2026.

8. Chief Gregory stated, in substance, that Plaintiff had "walked in, started yelling and cussing and screaming" inside City Hall and had "scared" the City's water clerk, who had been "offended" by Plaintiff's words—a description inconsistent with Plaintiff's contemporaneous audio recording of the inside-City-Hall interaction. Officer Beckham confirmed that an arrest could follow from a citizen's complaint of being "offended" by another's words.

9. Plaintiff's arrest was not an isolated incident but rather part of a pattern. Within the weeks preceding May 12, 2026, the Trinidad Police Department had: (a) arrested a Trinidad-area resident on a state-jail-felony charge under Tex. Penal Code § 42.06 (False Alarm or Report) in connection with the resident's Facebook posts about the City's water system and possible water-related hospitalizations; (b) on information and belief, arrested journalist Ron Helms on a criminal trespass charge in connection with Mr. Helms's investigative journalism activities at Trinidad City Hall, with bond set at $8,000.00; and (c) had Chief Gregory publish, on the Trinidad Police Department's official Facebook page, a public statement defending the state-jail-felony arrest of the Facebook poster, characterizing public criticism of the City's water-system enforcement as "misinformation," "false narratives," "fearmongering," and "fake news," and announcing that the statement would be his "one and only post regarding this matter." Plaintiff's protest at Trinidad City Hall on May 12, 2026 was a direct response to that pattern.

10. This action seeks compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs against the individual officers responsible for Plaintiff's unconstitutional seizure; against Chief Gregory in his individual and official capacities; and

against the City of Trinidad on multiple independent theories of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## II. PARTIES

11. Plaintiff **Winston Wesley Noles** is a natural person and a citizen of the United States and the State of Texas, residing in Hopkins County, Texas. He conducts citizen journalism under the name "Otto the Watchdog," through an Internet platform that includes a YouTube channel of the same name.

12. Defendant **Charles W. Gregory** is, and at all times relevant was, the Chief of Police of the City of Trinidad, Texas. He is sued in his individual capacity.

13. Defendant **Robert W. McCumsey** is, and at all times relevant was, a sergeant with the Trinidad Police Department. He is sued in his individual capacity.

14. Defendant **Cameron M. Beckham** is, and at all times relevant was, an officer with the Trinidad Police Department. He is sued in his individual capacity.

15. Defendant **Derrick Hocutt** is, and at all times relevant was, an officer with the Malakoff Police Department. He is sued in his individual capacity.

16. Defendant **City of Trinidad, Texas** is a municipal corporation organized and existing under the laws of the State of Texas.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), because the claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in Henderson County, Texas, which lies within the Tyler Division of the Eastern District of Texas. 28 U.S.C. § 124(c)(1).

## IV. FACTUAL ALLEGATIONS

### A. The Trinidad Police Department's Campaign of Retaliation Against Critics of the City's Water System

19. The City of Trinidad, Texas, operates a municipal water system. In or around spring 2026, the City issued a boil-water notice to residents due to low chlorine residual levels in parts of the water system. The notice and the underlying water-system issues drew public attention and community concern.

20. On or about April 6, 2026, the Trinidad Police Department published, on its official Facebook page, a post styled as a "PUBLIC INFORMATION NOTICE – WATER QUALITY" addressing the boil-water notice and related matters.

21. Shortly thereafter, a member of the public published a Facebook post stating, in substance, that "some citizens have been hospitalized due to bacteria in the water" and inviting other residents whose water was discolored or sediment-laden, or who had experienced related health issues, to send the page operator information about their experiences. The post was a community-organizing communication seeking information from citizens for the purpose of "identif[ying] patterns," "ensur[ing] the problem is addressed properly," and "support[ing] efforts to improve water quality for everyone." Plaintiff is informed and believes, and on that basis alleges, that the poster is a Trinidad-area resident who was subsequently arrested by the Trinidad Police Department, as described below. Plaintiff refers to that individual as the "Water-Post Arrestee."

22. On or about May 11, 2026—the day before Plaintiff's arrest—Defendant Gregory published, on the Trinidad Police Department's official Facebook page, a lengthy public statement

(the "Chief's Facebook Statement") addressing the Water-Post Arrestee's arrest and characterizing community criticism of the Department's enforcement actions.

23. The Chief's Facebook Statement was signed "-Chief Gregory," on the official Facebook page of the Trinidad Police Department. It refers to the Department as "my department," the position of Chief of Police as "this position," and to the official's duty as having "t[aken] an oath to protect this city." The statement characterizes residents who criticize the Department or who circulate information about water-system concerns as spreaders of "misinformation," "false narratives," "fearmongering," and "fake news," who are "contributing to the problem."

24. On or about the morning of May 12, 2026, Plaintiff attempted to compose a Facebook comment in response to the Chief's Facebook Statement. The ability to post comments on the Chief's Facebook Statement was unavailable to Plaintiff at that time. Plaintiff reserves all rights with respect to any claim arising from the unavailability of commenting access, pending development of the record through discovery.

25. Having observed both the Water-Post Arrestee's felony arrest and the Chief's Facebook Statement publicly defending it, Plaintiff traveled to Trinidad on May 12, 2026, to engage in a peaceful protest of those actions in person.

### B. Plaintiff's Visit Inside Trinidad City Hall

26. On May 12, 2026, Plaintiff traveled to Trinidad City Hall, located at 100 Park Street, Trinidad, Texas.

27. Plaintiff entered Trinidad City Hall during ordinary business hours. He spoke with a City employee. They conversed in a normal speaking tone. Plaintiff did not yell, scream, or threaten anyone. He used profanity on a single occasion—in a self-deprecating remark about the employee's surname ("That's a fucked up name. Sorry about that."). The employee responded with

the words "I've had worse," and the conversation continued cordially for several more minutes thereafter. Plaintiff and the employee discussed the building's air-filter return vent, the Texas Penal Code § 30.06 firearm-prohibition sign on the exterior of the building, and a potted plant inside the building. The employee told Plaintiff, in substance, that the § 30.06 sign would "be gone by the end of the day"—an admission that the sign as posted did not comply with the requirements of § 30.06(c)(3). Plaintiff departed the building by saying "Have a good day."

28. After Plaintiff exited, the doors of Trinidad City Hall were locked from inside. On information and belief, Trinidad City Hall maintains interior video-surveillance equipment that records the public areas of the building. That recording, when produced, will reflect the foregoing.

### C. Plaintiff's Protest Outside Trinidad City Hall

29. Plaintiff set up his recording equipment on the sidewalk and steps in front of Trinidad City Hall—a traditional public forum. He commenced a live broadcast on the Internet (the "Livestream"). He displayed three handheld signs:

- *Back the Blue*;
- *Fuck Bad Cops*; and
- *Shit Is Fucked Up And Stuff*.

30. Each sign was political and social commentary directed at perceived governmental conduct. Each sign constitutes core protected speech under the First Amendment.

31. During the Livestream, Plaintiff offered commentary critical of the Trinidad Police Department, including reference to the Water-Post Arrestee and the Chief's Facebook Statement. He stated that he was "standing on [his] First Amendment on the steps to City Hall."

### D. The Twenty-Minute Pre-Arrest Sequence

32. After livestreaming for about 22 minutes, Defendant Hocutt (Malakoff PD) arrived at the scene in a marked patrol vehicle. He approached Plaintiff and asked whether Plaintiff was "there with anyone." Plaintiff declined to answer. Defendant Hocutt did not order Plaintiff to leave, to lower his signs, to stop speaking, or to remedy any alleged disturbance. An officer (believed to be of the Tool Police Department), whose name is not presently known to Plaintiff, also arrived in the same general timeframe and remained near a marked patrol vehicle for the duration of the events described below.

33. Defendant Hocutt entered Trinidad City Hall. The doors, which had been locked from inside, were opened to permit his entry and then locked again. Defendant Hocutt remained inside Trinidad City Hall for approximately six minutes. On information and belief, during that time Defendant Hocutt spoke with one or more City employees regarding Plaintiff's earlier visit inside the building and gathered information later used as the asserted predicate for Plaintiff's arrest.

34. About 30 minutes into the Livestream, Defendant Beckham arrived at the scene in a marked Trinidad Police Department patrol vehicle. Defendant Beckham broadcast music through the patrol vehicle's public-address ("PA") system. The volume of the broadcast was sufficient that the music was clearly audible at Plaintiff's location and was captured by Plaintiff's recording equipment. On information and belief, Defendant Beckham's broadcast was undertaken for one or more of the following purposes: to interrupt or drown out Plaintiff's protected speech; to interfere with Plaintiff's recording or broadcast of police activity; to retaliate against Plaintiff for the content or viewpoint of his protected expression; or to cause Plaintiff's Internet broadcast to be subjected to automated copyright-enforcement action.

35. Defendant Hocutt exited Trinidad City Hall. He did not at that time announce that any offense had occurred or that Plaintiff was the subject of any complaint.

36. Defendants McCumsey and Beckham then entered Trinidad City Hall. The doors to the building were unlocked to permit their entry and then again locked. Defendant Hocutt remained outside, at or near his patrol vehicle. Defendants McCumsey and Beckham remained inside for approximately five minutes.

37. During the time that the Defendant officers entered Trinidad City Hall, the doors of the building remained locked to the public, and Plaintiff—who had recently been inside lawfully—was excluded from re-entering.

38. At about 36 minutes into the Livestream, Defendant Beckham exited Trinidad City Hall. Defendant McCumsey followed shortly thereafter. Neither at that moment nor at any point in the approximately six minutes that followed did the Defendant officers move to detain Plaintiff.

39. For several minutes, Defendants McCumsey and Beckham conversed with Plaintiff while Plaintiff continued to stand in front of City Hall holding his signs. During that conversation:

a. Defendant McCumsey requested that Plaintiff identify himself. Plaintiff declined, citing Tex. Penal Code § 38.02.

b. Defendant McCumsey indicated that the encounter had "became a criminal matter," and identified the asserted offense as "Disorderly conduct." He stated, in substance, that Plaintiff had "offended people inside the city hall."

c. Plaintiff asked Defendant McCumsey to identify the elements of the offense. Defendant McCumsey articulated those elements as: (i) being in a public place; (ii) using profane language; and (iii) offending "a citizen that is not a public servant."

Defendant McCumsey's recitation omitted the "immediate breach of the peace" element required by Tex. Penal Code § 42.01(a)(1).

d. Plaintiff asked, in substance, whether he could refrain from using the language to which the officers objected and receive a warning rather than be charged. Defendant McCumsey refused, stating: "No. You've already committed that offense."

e. Plaintiff asked Defendant McCumsey to identify the "non-employee of the government" whom he had allegedly offended. Defendant McCumsey did not identify any such person by name or position.

40. Defendant McCumsey's recitation of the elements of the offense omitted the only element of Tex. Penal Code § 42.01(a)(1) that distinguishes it from a content-based criminalization of speech: the requirement that the language used "by its very utterance tend[] to incite an immediate breach of the peace." In place of that element, Defendant McCumsey substituted the requirement that the speech have "offended" a non-public-servant—a subjective-offense standard that has been foreclosed by the Supreme Court for more than half a century. *Cohen*, 403 U.S. at 21; *Lewis*, 415 U.S. at 134; *Hill*, 482 U.S. at 461-63.

41. About 43 minutes into the Livestream, after Mr. Noles refused to identify himself and challenged the officers' understanding of the law, Defendant Beckham directed Defendant McCumsey to handcuff Plaintiff with the words "Hook him up." Defendant McCumsey complied. Defendant Hocutt was present at the moment of handcuffing, standing immediately behind Plaintiff within arm's reach. Plaintiff was informed that he was under arrest.

42. The total elapsed time between the first officer's arrival at the scene (Defendant Hocutt, at approximately 22:50 of the Livestream) and the handcuffing of Plaintiff (at approximately 43:10 of the Livestream) was approximately twenty minutes and twenty seconds.

During those twenty minutes, no act of violence occurred. No breach of peace occurred. No retaliatory altercation occurred. The Defendant officers stood with, conversed with, observed, and investigated Plaintiff for that entire duration—conduct categorically incompatible with the statutory requirement of an "immediate" breach of peace under Tex. Penal Code § 42.01(a)(1).

### E. Defendant Hocutt's Personal Participation in the Seizure

43. Defendant Hocutt is a peace officer of the City of Malakoff, a municipality with no geographic jurisdiction over Trinidad City Hall, was the first peace officer to arrive at the scene of Plaintiff's protected protest. He was present throughout the twenty-minute pre-arrest sequence. He personally entered Trinidad City Hall during the investigation and remained inside for approximately six minutes. On information and belief, Defendant Hocutt participated in the investigation by speaking with City employees inside Trinidad City Hall, by gathering information used as the asserted predicate for Plaintiff's arrest, and by relaying that information to Defendants McCumsey and Beckham.

44. Defendant Hocutt was personally present and within hearing distance when Defendant McCumsey recited to Plaintiff the unconstitutional elements of the asserted offense, when Defendant McCumsey denied Plaintiff's request for a warning, and when Defendant Beckham directed Defendant McCumsey to handcuff Plaintiff. Defendant Hocutt did not object to, attempt to correct, or intervene in any portion of this exchange.

45. At the moment of handcuffing, Defendant Hocutt stood immediately behind Plaintiff, within arm's reach. He observed Defendant McCumsey place handcuffs on Plaintiff. Following the handcuffing, Defendant Hocutt physically escorted the handcuffed Plaintiff from the public sidewalk in front of Trinidad City Hall toward the rear of a marked Trinidad Police Department patrol vehicle.

46. Defendant Hocutt's conduct—taking physical custody of a handcuffed citizen and escorting that citizen toward a marked patrol vehicle for confinement—constitutes direct participation in the seizure of Plaintiff.

47. After Plaintiff was confined in the rear of the patrol vehicle, Defendant Hocutt approached and conversed with Plaintiff. Plaintiff asked Defendant Hocutt, in substance, whether — having observed his fellow officer's conduct—he had a duty to intervene to prevent a constitutional violation. Defendant Hocutt responded, in substance, that he had not observed any such violation. That statement is itself evidence that Defendant Hocutt applied the same unconstitutional standard articulated by Defendant McCumsey in his presence.

**F. The Continued Detention and Chief Gregory's Arrival**

48. After being placed in handcuffs, Plaintiff was uncuffed momentarily to allow him to secure his recording equipment. Defendants McCumsey and Beckham then re-cuffed Plaintiff and placed him in the rear of a marked patrol vehicle.

49. Plaintiff remained handcuffed in the rear of the patrol vehicle for approximately thirty to forty minutes while the Defendant officers waited for their chief to show up to give further instructions. During this period of continued custody, the ambient temperature outside was warm. Plaintiff was confined in the back of a marked patrol vehicle, in handcuffs, and was not permitted to leave.

50. Defendant Gregory was off duty and at his residence at the time of Plaintiff's initial seizure. He was summoned to the scene. Upon his arrival, Defendant Gregory was briefed by his officers. He personally decided that Plaintiff would be released on a citation rather than formally magistrated. The arresting officers—Defendants McCumsey and Beckham—had previously

informed Plaintiff that the decision whether to take him before a magistrate or to release him on a citation was pending. Defendant Gregory made that decision.

51. Defendant Gregory's decision was an exercise of policymaking authority formally delegated to him by the City of Trinidad's Code of Ordinances. Trinidad Code of Ordinances § 32.048 vests in the Chief of Police "supervision over the other members of the Police Department." Section 32.052 provides that "[t]he Chief of Police is responsible for the day to day operation of the Police Department" and that he "may, from time to time, issue orders or specific policy statements for the Police Department." No provision of the Trinidad Code of Ordinances subjects the Chief's day-to-day operational decisions—including individual decisions regarding arrest, magistration, citation, and release—to administrative review by any superior official or body.

### G. The Continued Custody After Chief Gregory's Cite-and-Release Decision

52. After Defendant Gregory's cite-and-release decision was made, Plaintiff remained handcuffed in the rear of the patrol vehicle for at least an additional twenty minutes.

53. Once Defendant Gregory had decided that Plaintiff would not be formally taken to a magistrate, no basis remained for any continued custodial seizure. The cite-and-release decision necessarily reflected the police judgment that no formal book-and-magistrate process was warranted and concomitantly that continued custodial detention was unnecessary. The Defendant officers' continuation of Plaintiff's cuffed detention beyond that point was an unreasonable seizure under the Fourth Amendment, distinct from the initial arrest.

54. At approximately 2:52 p.m. on May 12, 2026, Plaintiff was issued Citation No. 36889 by Defendant McCumsey (Trinidad PD ID No. 792) for "Disorderly Conduct (Language)."

55. Upon his release, Plaintiff immediately departed Trinidad. He did so out of a well-founded fear that, if he remained on scene, he would be re-arrested in retaliation for his continued exercise of First Amendment rights. The chilling of First Amendment activity is itself a cognizable injury.

### H. Chief Gregory's Subsequent Statements to Journalist Ron Helms

56. While Plaintiff was handcuffed in the back of the patrol vehicle, journalist Ron Helms arrived at the scene to investigate Plaintiff's arrest. Mr. Helms conducted a live Internet broadcast of his conversations with Trinidad Police Department personnel, including Defendant Gregory and Defendant Beckham (the "Helms Recording").

57. In the Helms Recording, Defendant Gregory stated, in substance, that the basis for Plaintiff's arrest was that Plaintiff had "walked in, started yelling and cussing and screaming" inside Trinidad City Hall, and the City's water clerk was "offended" by Plaintiff's words.

58. Defendant Beckham, when asked by Mr. Helms whether saying "fuck you" to a person who reported being offended would result in arrest, confirmed in substance that an arrest could follow upon the filing of such a complaint.

59. These statements—taken together with Defendant McCumsey's contemporaneous recitation of the asserted elements of the offense as including "offended a citizen that is not a public servant" and Chief Gregory's published characterization of community criticism as "misinformation" and "fake news"—establish that the legal standard applied by the Defendant officers and Defendant Gregory was that a citizen could be arrested for words that caused another person subjective offense. That is not the standard under Tex. Penal Code § 42.01(a)(1), and it is not a constitutional standard for arrest under any circumstances.

### I. The Defendant Officers' Backgrounds and Lack of First Amendment Training

60. According to TCOLE records, **none of the four Defendant officers has ever received a single hour of training in the First Amendment, the constitutional limits on arrest authority for protected speech, the law governing police interactions with protesters or journalists, or the principles of *Cohen v. California*, *City of Houston v. Hill*, *Gooding v. Wilson*, or any analogous First Amendment authority**.

61. On information and belief, the City of Trinidad provides no in-house training on First Amendment limits on arrest authority and has not adopted a written policy or general order specifically directed at the constitutional limits on arrest for protected speech. On information and belief, prior to hiring each Defendant Trinidad PD officer, the City of Trinidad failed to obtain or meaningfully review the officer's separation records from prior agencies under Tex. Occ. Code § 1701.4535, or otherwise failed to investigate the reasons for the officer's departures from prior agencies. Given the unusually transient employment histories of all three Trinidad PD Defendants, the City's failure to investigate or address that pattern in its hiring decisions was deliberately indifferent to the rights of citizens with whom the officers would predictably interact.

### J. The Absence of Probable Cause for Disorderly Conduct

62. There was no probable cause to arrest Plaintiff for any offense, for at least the following independent reasons:

(a) *First*, the speech for which Plaintiff was arrested—the words on his protest signs, his oral commentary during his outdoor protest, and his single use of profanity in conversation with a City employee inside City Hall—was constitutionally protected. Arrest for the content of constitutionally protected speech is per se without probable cause.

(b) *Second*, the statutory element of "immediate breach of the peace" was not satisfied as a matter of law. Defendant officers stood with Plaintiff for approximately twenty minutes before placing him in handcuffs. They conversed with him, went inside City Hall, came back outside, played music, and took notes. No breach of peace was occurring or imminent during those twenty minutes. The deliberative pace and duration of the Defendant officers' investigation conclusively forecloses any claim that an "immediate" breach of peace was at issue.

(c) *Third*, the Defendant officers articulated, contemporaneously and on the record, an unconstitutional standard for arrest: that the speech "offended a citizen that is not a public servant." Offense is not, and never has been, a constitutional basis for arrest for protected speech.

(d) *Fourth*, at the time of arrest, the Defendant officers were unable to identify by name or position any person whose putative offense at Plaintiff's words constituted the basis for arrest. The asserted complainant was described only as "a citizen that is not a public servant" inside City Hall. No such person was produced or named.

(e) *Fifth*, to the extent the Defendant officers contend that they reasonably relied on a citizen complaint received during their pre-arrest investigation, any such reliance was objectively unreasonable as a matter of clearly established law. An officer's reliance on a complainant's account does not establish probable cause where, even crediting the complaint, the conduct described does not constitute an offense. A citizen's report of being "offended" by another's profane speech in a public place does not, as a matter of clearly established law, constitute probable cause under § 42.01(a)(1).

# V. CLAIMS FOR RELIEF

## COUNT ONE

**42 U.S.C. § 1983—Fourth Amendment—Unreasonable Seizure (Initial Arrest) Against Defendants McCumsey, Beckham, Gregory, and Hocutt**

63. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

64. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.

65. On May 12, 2026, Defendants Beckham and McCumsey effected an arrest of Plaintiff by placing him in handcuffs, informing him that he was under arrest, and placing him in the rear of a marked patrol vehicle. The seizure was a full custodial arrest, not a brief investigative detention.

66. There was no probable cause to arrest Plaintiff. The asserted basis for arrest—Plaintiff's protected speech inside and outside Trinidad City Hall—did not constitute an offense under Tex. Penal Code § 42.01(a)(1) or any other statute.

67. Defendant Gregory, although not present at the initial seizure, became personally involved in the continuing seizure when he arrived on scene, was briefed on the basis for the seizure, and elected—under his policymaking authority—to continue the seizure through cite-and-release rather than terminate it.

68. Defendant Hocutt was personally involved in the seizure through his initial investigation inside Trinidad City Hall, his on-information-and-belief gathering of information used as the asserted predicate for arrest, his continuous presence throughout the twenty-minute pre-arrest sequence, his arm's-reach position behind Plaintiff at the moment of handcuffing, and—

most directly—his physical escort of the handcuffed Plaintiff from the public sidewalk toward the rear of the marked Trinidad Police Department patrol vehicle.

69. At the time of the events alleged, the law was clearly established that:

(a) Police officers may not arrest a citizen on the basis of profane or insulting speech directed at government, *Cohen v. California*, 403 U.S. 15 (1971); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974);

(b) Police officers may not arrest a citizen who verbally challenges or insults them, *City of Houston v. Hill*, 482 U.S. 451 (1987);

(c) State disorderly-conduct statutes prohibiting profane speech are constitutionally permissible only if narrowly construed to reach "fighting words" tending to incite an *immediate* breach of the peace, *Gooding v. Wilson*, 405 U.S. 518 (1972); *Coggin v. State*, 123 S.W.3d 82 (Tex. App.—Austin 2003); *Ross v. State*, 802 S.W.2d 308 (Tex. App.—Dallas 1990); and

(d) An arrest without probable cause violates the Fourth Amendment, *Devenpeck v. Alford*, 543 U.S. 146 (2004).

70. Each Defendant officer's conduct was objectively unreasonable in light of clearly established law. No reasonable officer in their position could have believed that the seizure of Plaintiff for the content of his protected speech, in the circumstances described, was lawful—particularly where Defendant McCumsey articulated an unconstitutional offense standard on the contemporaneous record.

71. As a direct and proximate result of Defendants' unlawful seizure of Plaintiff, he suffered injuries including deprivation of liberty, physical discomfort, mental and emotional

distress, loss of professional time and opportunity, damage to reputation, and the chilling of his constitutional rights.

## COUNT TWO
### 42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Prolonged Seizure (Continued Custody After Cite-and-Release Decision) Against Defendants McCumsey, Beckham, and Gregory

72. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

73. Once Defendant Gregory made the decision that Plaintiff would be released on a citation rather than formally taken to a magistrate, no probable cause for any continued custodial seizure remained. The cite-and-release decision reflected the police judgment that no formal book-and-magistrate process was warranted and concomitantly that continued custodial restraint was unnecessary.

74. Despite that decision, Defendants McCumsey and Beckham continued to detain Plaintiff, handcuffed in the rear of a patrol vehicle, for at least twenty additional minutes. They did so under the direct supervision and authority of Defendant Gregory, who was on scene throughout that period.

75. Continued cuffed detention of a citizen for whom the police have elected cite-and-release, in the absence of any independent justification, is an unreasonable seizure under the Fourth Amendment. The constitutional rule that the scope and duration of a seizure cannot exceed its lawful predicate was clearly established at the time of the events alleged.

76. As a direct and proximate result of the continued unlawful seizure, Plaintiff suffered additional injuries.

## COUNT THREE
### 42 U.S.C. § 1983 — First Amendment — Retaliation and Content/Viewpoint Discrimination for Protected Speech

**Against Defendants McCumsey, Beckham, Gregory, and Hocutt**

77. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

78. Plaintiff engaged in constitutionally protected activity, including: (a) entering Trinidad City Hall to investigate matters of public concern; (b) standing on a public sidewalk in front of City Hall; (c) displaying signs that constitute political and social commentary; (d) live-broadcasting his observations on the Internet; (e) speaking in a manner critical of the Trinidad Police Department and local government; and (f) traveling to Trinidad to protest the state-jail-felony arrest of the Water-Post Arrestee and the Chief's public statement defending that arrest.

79. Defendants' adverse actions—including the arrest, the prolonged custodial detention, the issuance of the citation, and the broadcast of music at Plaintiff during his protected expression—were each injuries that would chill a person of ordinary firmness from continuing to engage in protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

80. Defendants' adverse actions were substantially motivated by the content and viewpoint of Plaintiff's expression. The Chief's Facebook Statement—published in Defendant Gregory's official capacity on the Trinidad Police Department's official Facebook page in the days immediately before Plaintiff's arrest—itself characterizes critics of the Department's enforcement actions as enemies of the community ("contributing to the problem," "fake news," "fearmongering"). The contemporaneous statements of Defendant McCumsey on scene (that Plaintiff had "offended" a non-public-servant) and Defendant Gregory's subsequent statements to Mr. Helms (that the basis was the water clerk being "offended" and that Plaintiff had been arrested for his words) establish that the substantial motivating cause was the content and viewpoint of Plaintiff's expression.

81. Defendant Beckham's broadcast of music through his patrol vehicle's PA system, audible at Plaintiff's location during his protected First Amendment expression, was conduct intended or reasonably calculated to interfere with Plaintiff's protected expression, recording, and Internet broadcast, and constituted content- and viewpoint-based interference with First Amendment activity. The arrest of Plaintiff for displaying signs reading *Fuck Bad Cops* and *Shit Is Fucked Up And Stuff*, and for speech critical of local government, while citizens engaging in pro-police or pro-municipal speech were not arrested for comparable use of profanity in public, constitutes viewpoint-based law enforcement in violation of the First Amendment.

82. Although *Nieves v. Bartlett*, 587 U.S. 391 (2019), ordinarily requires a plaintiff bringing a retaliatory-arrest claim to plead the absence of probable cause, Plaintiff satisfies that requirement as set forth in Count One. In the alternative, the *Nieves* exception applies. There is objective evidence that similarly situated individuals—namely, persons who used profanity in public in Trinidad without engaging in critical-of-government speech—have not been arrested under § 42.01(a)(1). Defendant Beckham's own statement in the Helms Recording—that arrest under these circumstances requires that someone "file a complaint"—confirms that the Trinidad Police Department's enforcement of § 42.01(a)(1) is driven by complaint-based, content-discriminatory factors rather than by neutral application of statutory criteria. *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam).

83. The right to be free from First Amendment-retaliatory arrest and from content- or viewpoint-based law enforcement was clearly established at the time of the events alleged. *Hartman v. Moore*, 547 U.S. 250 (2006); *Keenan*, 290 F.3d at 258; *Hill*, 482 U.S. at 461-63.

84. As a direct and proximate result of Defendants' retaliatory and viewpoint-discriminatory conduct, Plaintiff suffered the injuries described in this Complaint, including the chilling effect of having his speech criminalized.

**COUNT FOUR**
**42 U.S.C. § 1983**—Municipal Liability
**Against the City of Trinidad, Texas**

85. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

86. A municipality is liable under 42 U.S.C. § 1983 when execution of a government's policy or custom—whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy—inflicts the injury. Plaintiff pleads the following independent and alternative theories. Any one, if proved, suffices.

***A. Final Policymaker—Chief Gregory's Decision***

87. The City of Trinidad has, by its Code of Ordinances, formally delegated to the Chief of Police final authority over the operational decisions of the Police Department. Trinidad Code of Ordinances § 32.048 vests "supervision over the other members of the Police Department" in the Chief. Section 32.052 makes the Chief "responsible for the day to day operation of the Police Department" and authorizes him to "issue orders or specific policy statements." Although § 32.053 provides that general departmental policies are approved by the City Council, no provision of the Code subjects individual operational decisions—including the decision whether to arrest, magistrate, or cite a particular citizen—to administrative review. The Chief of Police is therefore the final policymaker for the City of Trinidad with respect to operational arrest, detention, and release decisions, and with respect to the operation of the Department's official social-media

presence. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

88. On May 12, 2026, Defendant Gregory exercised that final policymaking authority by personally deciding that Plaintiff would be cited and released for an offense for which there was no probable cause. He had previously exercised that authority by causing the Department to seek a Facebook search warrant for the Water-Post Arrestee, by directing the felony arrest of the Water-Post Arrestee, and by publishing the Chief's Facebook Statement defending that arrest in his official capacity. Under *Pembaur*, the City of Trinidad is liable for the constitutional violations alleged.

### *B. Ratification by the City Council*

89. In the alternative, the City of Trinidad is liable through ratification by its City Council—the formal policymaker under § 32.053. Before May 12, 2026, the Trinidad Police Department had effected the state-jail-felony arrest of the Water-Post Arrestee, the arrest of Mr. Helms on a criminal trespass theory, and Chief Gregory's publication of the Chief's Facebook Statement on the Department's official page. On information and belief, the City Council was aware of these matters at one or more regular meetings, and took no action to investigate, correct, discipline, or change the Police Department's practices. The Council's inaction in the face of a pattern of First Amendment-retaliatory law enforcement constitutes ratification.

### *C. Custom or Practice of First Amendment Retaliation*

90. Independent of any formal policymaker designation, the City of Trinidad has developed a custom or practice of First Amendment-retaliatory law enforcement directed at critics of the City's water system and other matters of local-government concern. The custom is evidenced by:

(a) The state-jail-felony arrest of the Water-Post Arrestee under Tex. Penal Code § 42.06 for Facebook speech soliciting community information about water-related health issues;

(b) The arrest of journalist Ron Helms for investigative journalism activities, on a criminal trespass theory and with an $8,000 bond;

(c) The Chief's Facebook Statement publicly defending the felony arrest and characterizing community critics as enemies of the community ("misinformation," "false narratives," "fearmongering," "fake news," "contributing to the problem");

(d) The multi-agency, multi-officer response to Plaintiff's peaceful protest at City Hall, reportedly responding at a high rate of speed;

(e) Defendant Beckham's use of his patrol vehicle's PA system to broadcast music at Plaintiff during his protected expression; and

(f) The arrest of Plaintiff on a charge predicated on the same content-based, offense-as-element standard that Defendant McCumsey articulated to Plaintiff.

91. This custom is sufficiently widespread and persistent to fairly represent municipal policy. The City of Trinidad is liable under *Monell* for the harm caused by that custom.

### *D. Failure to Train (Canton/Connick)*

92. Under *City of Canton v. Harris*, 489 U.S. 378 (1989), a municipality is liable where its failure to train its officers reflects deliberate indifference to the rights of those with whom the officers come into contact, including where the need for training is so obvious that the policymakers can reasonably be said to have been deliberately indifferent. *Connick v. Thompson*,

563 U.S. 51 (2011), recognizes that such single-incident liability is available where the need for training is patent.

93. The need for training Trinidad police officers on First Amendment limits on arrest authority is patently obvious. Police officers in any municipality predictably encounter citizens exercising First Amendment rights—recording, protesting, criticizing government, journalism. The need was particularly obvious in Trinidad in the spring of 2026, when the Department had effected at least two First Amendment-retaliatory arrests within weeks and the Chief had publicly characterized public criticism of the Department as the enemy of "truth." Despite this obvious need, none of the four Defendant officers has ever received any training on First Amendment limits on arrest authority. The City's failure to train was a moving force behind the constitutional violations alleged. Officers trained on the elementary First Amendment limits on arrest authority would not have effected the seizures alleged here and would not have articulated the unconstitutional offense standard captured on the contemporaneous record.

### *E. Deliberate Indifference in Hiring (Bryan County)*

94. Under *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997), a municipality may be liable for hiring an officer where the constitutional violation was a plainly obvious consequence of the hiring decision. Each of the three Defendant Trinidad PD officers exhibits an unusually transient employment history. On information and belief, the City of Trinidad failed to meaningfully investigate the reasons for the officers' departures from prior agencies—including by failure to obtain or review F-5 separation reports under Tex. Occ. Code § 1701.453, by failure to interview prior supervisors, and by failure to consider the pattern of short tenures as a hiring risk factor. The City's failure to investigate was deliberately indifferent to the rights of citizens with whom the Defendant officers would predictably interact.

### *F. Failure to Supervise and Discipline*

95. The City of Trinidad and Chief Gregory failed to discipline or supervise the Defendant Trinidad PD officers for the conduct alleged. No internal-affairs investigation has been undertaken, no body-worn-camera review has been conducted, no remedial training has been ordered, and no policy revisions have been adopted. This failure, considered alongside the pattern described herein, is itself a custom that represents municipal policy.

## VI. DAMAGES

96. As a direct and proximate result of the conduct of Defendants set forth herein, Plaintiff has suffered, and continues to suffer:

(a) Deprivation of liberty during the arrest and prolonged custody;

(b) Physical discomfort and pain from handcuffing and prolonged confinement in a warm patrol vehicle;

(c) Mental anguish, emotional distress, anxiety, humiliation, and fear of further arrest;

(d) Chilling of First Amendment rights, including curtailment of Plaintiff's ongoing journalism and protest activity in Trinidad;

(e) Loss of professional time, opportunity, and reputation; and

(f) The pendency of an unresolved criminal citation requiring Plaintiff to expend additional time and resources to defend himself in the Trinidad Municipal Court.

97. Plaintiff is entitled to compensatory damages in an amount to be proved at trial. The individual Defendants' conduct was intentional, knowing, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against the

individual Defendants in an amount to be proved at trial. Plaintiff is also entitled to a reasonable attorneys' fee and costs of court under 42 U.S.C. § 1988.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Winston Wesley Noles respectfully requests that, upon final hearing or trial of this matter, this Court enter judgment in his favor and against Defendants as follows:

A. Declaring that the conduct of Defendants alleged herein violated Plaintiff's rights under the First and Fourth Amendments to the United States Constitution;

B. Declaring that the City of Trinidad's custom of First Amendment-retaliatory law enforcement directed at critics of its water system and other local-government conduct violates the First Amendment;

C. Enjoining Defendants from enforcing Texas Penal Code § 42.01 against speech that constitutes constitutionally protected criticism of government;

D. Enjoining Defendants from using police-issued public-address equipment to disrupt or interfere with citizens engaged in protected First Amendment expression;

E. Awarding Plaintiff nominal damages for First Amendment violations;

F. Awarding Plaintiff compensatory damages in an amount to be proved at trial;

G. Awarding Plaintiff punitive damages against the individual Defendants in an amount to be proved at trial;

H. Awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

I. Awarding Plaintiff pre- and post-judgment interest at the maximum rate allowed by law; and

J. Granting Plaintiff such other and further relief, at law or in equity, to which he may be justly entitled.

## VIII. VIII. JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable, pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

Respectfully submitted,

**GRABLE PLLC**

*/s/ Brandon J. Grable*
**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@grable.law
12451 Starcrest Drive, Ste 206
San Antonio, Texas 78216
Telephone: (210) 963-5297
Facsimile: (726) 215-4765
**Counsel for Plaintiffs**