**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **WINSTON WESLEY NOLES**, *Plaintiff* | § § § | |
| **v.** | § | **Case No.6:26-CV-00221** |
| **CHARLES W. GREGORY, ROBERT W. McCUMSEY, CAMERON M. BECKHAM, DERRICK HOCUTT,** and **CITY OF TRINIDAD, TEXAS**, *Defendants*. | § § § § § § § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii
TABLE OF AUTHORITIES ..... iii
I. INTRODUCTION ..... 1
II. PARTIES ..... 4
III. JURISDICTION AND VENUE ..... 4
IV. FACTUAL ALLEGATIONS ..... 5
V. CLAIMS FOR RELIEF ..... 19
1. 42 U.S.C. § 1983—Fourth Amendment—Unreasonable Seizure (Initial Arrest) ..... 19
2. 42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Prolonged Seizure ..... 21
3. 42 U.S.C. § 1983 — First Amendment — Retaliation and ..... 22
4. 42 U.S.C. § 1983—Municipal Liability ..... 24
VI. DAMAGES ..... 28
VII. PRAYER FOR RELIEF ..... 29
VIII. JURY DEMAND ..... 30

## TABLE OF AUTHORITIES

**Cases**

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997) ........ 28
*City of Canton v. Harris*, 489 U.S. 378 (1989) ........ 27
*City of Houston v. Hill*, 482 U.S. 451 (1987 ........ 2, 20
*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ........ 25
*Cohen v. California*, 403 U.S. 15 (1971) ........ 2, 11, 20
*Connick v. Thompson*, 563 U.S. 51 (2011) ........ 27
*Devenpeck v. Alford*, 543 U.S. 146 (2004) ........ 20
*Gonzalez v. Trevino*, 602 U.S. 653 (2024) ........ 23
*Hartman v. Moore*, 547 U.S. 250 (2006) ........ 23
*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) ........ 22, 23
*Lewis v. City of New Orleans*, 415 U.S. 130 (1974) ........ 2, 11, 20
*Nieves v. Bartlett*, 587 U.S. 391 (2019) ........ 23
*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ........ 25

**Statutes**

28 U.S.C. § 1391(b)(2) ........ 5
28 U.S.C. §§ 1331 ........ 4
42 U.S.C. § 1983 ........ 4
42 U.S.C. § 1988 ........ 29
Tex. Occ. Code § 1701.453 ........ 28
Tex. Penal Code § 42.01(a)(1) ........ passim
Texas. 28 U.S.C. § 124(c)(1) ........ 5

**Rules**

Trinidad Code of Ordinances C§ 32.048 ........ 14, 24

Plaintiff Winston Wesley Noles ("Plaintiff" or "Mr. Noles") files this First Amended Complaint against Defendants Charles W. Gregory, Robert W. McCumsey, Cameron M. Beckham, Derrick Hocutt, and the City of Trinidad, Texas, and would respectfully show the Court as follows:

# I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983 to redress violations of the First, Fourth, and Fourteenth Amendments. On May 12, 2026, four police officers from three separate municipal police departments converged on Trinidad City Hall in response to a single citizen, Plaintiff Winston Wesley Noles, a citizen journalist known as "Otto the Watchdog," who was standing in front of Trinidad's City Hall holding political signs. Mr. Noles had come to Trinidad to protest a recent state-jail-felony arrest by the Trinidad Police Department of a citizen who had used Facebook to ask other residents about possible water-quality-related health issues, and to question a Texas Penal Code § 30.06 firearm-prohibition sign on the exterior of Trinidad City Hall that did not comply with Texas law.

2. Over approximately twenty minutes—while Mr. Noles peacefully continued his protest, while officers went inside City Hall and returned, while a senior Trinidad officer arrived and broadcast music over his patrol vehicle's loudspeaker, and while officers conferred among themselves—no breach of peace occurred. At the end of those twenty minutes, the officers announced that Mr. Noles was under arrest, placed him in handcuffs, and physically escorted him to the rear of a marked patrol vehicle. He was cited for the words on his signs and for words spoken inside City Hall thirty minutes earlier in a brief conversation with a single City employee.

3. The factual predicate Defendants publicly asserted for Plaintiff's arrest did not exist. The City employee whom Chief Gregory identified as having been "scared" and "offended"

by Plaintiff was not in fact offended, never reported being offended, and filed no complaint. Three days after she submitted a sworn statement confirming this, the City Administrator terminated her without notice, without prior discipline, and without notifying the Mayor. The Trinidad Municipal Judge to whom that statement was submitted was also terminated.

4. Mr. Noles's signs read, *Back the Blue*, *Fuck Bad Cops*, and *Shit Is Fucked Up And Stuff*. His commentary, broadcast live on the Internet, criticized the Trinidad Police Department's enforcement actions against critics of local government and the City's handling of the underlying water issues. Each sign and each statement was core protected speech under the First Amendment.

5. Defendant Sergeant McCumsey articulated the asserted elements of the offense as: being in a public place, using profane language, and offending "a citizen that is not a public servant." That recitation omits the "immediate breach of the peace" element of Tex. Penal Code § 42.01(a)(1) entirely and substitutes subjective offense—a standard the Supreme Court has foreclosed for more than half a century. *Cohen v. California*, 403 U.S. 15 (1971); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974); *City of Houston v. Hill*, 482 U.S. 451 (1987).

6. Plaintiff asked whether he could receive a warning if he stopped using the language to which the officers objected. Defendant McCumsey refused: "No. You've already committed that offense."

7. Defendant Officer Beckham directed Defendant McCumsey to handcuff Plaintiff. Defendant Hocutt, a Malakoff Police Department officer responding to Trinidad, stood immediately behind Plaintiff within arm's reach during the handcuffing and then physically escorted the handcuffed Plaintiff from the public sidewalk to the rear of a marked Trinidad Police Department patrol vehicle.

8. Plaintiff was held in handcuffs in the rear of a patrol vehicle for approximately thirty to forty additional minutes while officers determined what actions to take. Defendant Chief Gregory, who had been at his residence at the time of the seizure, was summoned to the scene. He personally decided that Plaintiff would be released on a citation rather than magistrated. Despite that decision, Plaintiff remained handcuffed in the patrol vehicle for at least an additional twenty minutes while paperwork was completed. He was ultimately issued Citation No. 36889 for "Disorderly Conduct (Language)," Tex. Penal Code § 42.01, with a court date of May 27, 2026.

9. Chief Gregory stated, in substance, that Plaintiff had "walked in, started yelling and cussing and screaming" inside City Hall and had "scared" the City's water clerk, who had been "offended" by Plaintiff's words. Officer Beckham confirmed that an arrest could follow from a citizen's complaint of being "offended" by another's words. Defendant Gregory's description was false. The City's water clerk was not offended by, and did not feel threatened by, Plaintiff's conduct inside Trinidad City Hall, and did not file any complaint—verbal or written—against Plaintiff on May 12, 2026.

10. The City's pattern of retaliation continued after Plaintiff's arrest. On **Friday**, May 15, 2026, the City's water clerk—the person whom Defendant Gregory had publicly identified as the basis for Plaintiff's arrest—submitted to Defendant McCumsey, on a Trinidad Police Department Voluntary Statement form, a signed sworn statement expressly disclaiming any offense, with the words "<u>NEVER OFFENDED</u>" capitalized and underlined. On **Monday**, May 18, 2026, the water clerk was summarily terminated by the City Administrator without notice, without prior discipline, without a written termination letter, and without the Mayor's knowledge or authorization.

11. Plaintiff's protest on May 12, 2026 was a direct response to a pattern of First Amendment-retaliatory enforcement by the Trinidad Police Department in the weeks preceding, including the state-jail-felony arrest of the Water-Post Arrestee, the criminal-trespass arrest of journalist Ron Helms, and the Chief's Facebook Statement defending those actions.

## II. PARTIES

12. Plaintiff **Winston Wesley Noles** is a natural person and a citizen of the United States and the State of Texas, residing in Hopkins County, Texas. He conducts citizen journalism under the name "Otto the Watchdog," through an Internet platform that includes a YouTube channel of the same name.

13. Defendant **Charles W. Gregory** is, and at all times relevant was, the Chief of Police of the City of Trinidad, Texas. He is sued in his individual capacity.

14. Defendant **Robert W. McCumsey** is, and at all times relevant was, a sergeant with the Trinidad Police Department. He is sued in his individual capacity.

15. Defendant **Cameron M. Beckham** is, and at all times relevant was, an officer with the Trinidad Police Department. He is sued in his individual capacity.

16. Defendant **Derrick Hocutt** is, and at all times relevant was, an officer with the Malakoff Police Department. He is sued in his individual capacity.

17. Defendant **City of Trinidad, Texas** is a municipal corporation organized and existing under the laws of the State of Texas.

## III. JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), because the claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

19. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in Henderson County, Texas, which lies within the Tyler Division of the Eastern District of Texas. 28 U.S.C. § 124(c)(1).

## IV. FACTUAL ALLEGATIONS

### A. The Trinidad Police Department's Campaign of Retaliation Against Critics of the City's Water System

20. The City of Trinidad, Texas, operates a municipal water system. In or around spring 2026, the City issued a boil-water notice to residents due to low chlorine residual levels in parts of the water system. The notice and the underlying water-system issues drew public attention and community concern.

21. A member of the public published a Facebook post stating, in substance, that "some citizens have been hospitalized due to bacteria in the water" and inviting other residents whose water was discolored or sediment-laden, or who had experienced related health issues, to send the page operator information about their experiences. The post was a community-organizing communication seeking information from citizens for the purpose of "identif[ying] patterns," "ensur[ing] the problem is addressed properly," and "support[ing] efforts to improve water quality for everyone." Plaintiff is informed and believes, and on that basis alleges, that the poster is a Trinidad-area resident who was subsequently arrested by the Trinidad Police Department, as described below. Plaintiff refers to that individual as the "Water-Post Arrestee."

22. On or about May 11, 2026—the day before Plaintiff's arrest—Defendant Gregory published, on the Trinidad Police Department's official Facebook page, a lengthy public statement (the "Chief's Facebook Statement") addressing the Water-Post Arrestee's arrest and characterizing community criticism of the Department's enforcement actions.

23. Having observed both the Water-Post Arrestee's felony arrest and the Chief's Facebook Statement publicly defending it, Plaintiff traveled to Trinidad on May 12, 2026, to engage in a peaceful protest of those actions in person.

**B. Plaintiff's Visit Inside Trinidad City Hall**

24. On May 12, 2026, Plaintiff traveled to Trinidad City Hall, located at 100 Park Street, Trinidad, Texas.

25. When Plaintiff entered Trinidad City Hall on May 12, 2026, four City personnel were present in the building: (a) the City Administrator, who was in the water clerk's office at the time of Plaintiff's arrival; (b) a sitting member of the Trinidad City Council; (c) the Municipal Court Judge; and (d) the City's water clerk. Three of the four were public servants.

26. Plaintiff took photographs of the lobby and the council chambers—lawful activity in a public building.

27. During Plaintiff's photography, the City Administrator directed the water clerk to leave her office and go elsewhere in the building so that Plaintiff could not see her. The water clerk complied and went to the restroom and the break room area.

28. Plaintiff thereafter had a brief conversation with the City Administrator. He commented on the building's air-filter return vent. He asked the City Administrator her name. She identified herself, in substance, as "Sam Dozier." Plaintiff made a self-deprecating joke about the name being "a fucked up name." That was Plaintiff's single use of profanity inside City Hall. The City Administrator did not appear offended; the water clerk, who overheard the exchange from the adjacent area, found it humorous.

29. Plaintiff then commented on a small Jesus figurine on the front window, observed that the building's plants were dying, and asked about the Texas Penal Code § 30.06 firearm-

prohibition sign on the exterior of the building. He offered to take the noncompliant sign down. The City Administrator told him, in substance, that the sign would "be taken down by the end of the day"—an admission that the sign as posted did not comply with § 30.06(c)(3).

30. Plaintiff exited the building voluntarily. No one asked him to leave. He did not yell, scream, threaten, or raise his voice at any time inside the building. He used profanity on one occasion only, in the self-deprecating joke about the City Administrator's surname.

31. The water clerk looked out the window and pointed out that Plaintiff had posters and a camera set up outside. The City Administrator approached the front door and locked it. Plaintiff, who had observed the act, briefly attempted to re-enter. The doors remained locked from the inside for the remainder of the events at issue.

32. Neither the water clerk nor any other City personnel inside Trinidad City Hall called 9-1-1 or otherwise summoned uniformed police to the scene. Instead, the Trinidad Municipal Court judge—who was present in the building—sent a text message to Defendant Beckham, who was off-site at the time, asking him to respond.

33. The water clerk never told anyone—inside City Hall, to any officer on scene, or otherwise—that she was offended or threatened by Plaintiff's conduct. She did not request police assistance. She did not request that any charges be filed. She did not file a complaint of any kind, verbal or written, on May 12, 2026.

34. Plaintiff is informed and believes, and on that basis alleges, that interior video-surveillance recordings exist that capture the inside-City-Hall interaction described above and corroborate this account.

### C. Plaintiff's Protest Outside Trinidad City Hall

35. Plaintiff set up his recording equipment on the sidewalk and steps in front of Trinidad City Hall—a traditional public forum. He commenced a live broadcast on the Internet (the "Livestream"). He displayed three handheld signs:

- *Back the Blue*;
- *Fuck Bad Cops*; and
- *Shit Is Fucked Up And Stuff*.

36. Each sign was political and social commentary directed at perceived governmental conduct. Each sign constitutes core protected speech under the First Amendment.

37. During the Livestream, Plaintiff offered commentary critical of the Trinidad Police Department, including reference to the Water-Post Arrestee and the Chief's Facebook Statement. He stated that he was "standing on [his] First Amendment on the steps to City Hall."

### D. The Twenty-Minute Pre-Arrest Sequence

38. After livestreaming for about 22 minutes, Defendant Hocutt (Malakoff PD) arrived at the scene in a marked patrol vehicle. He approached Plaintiff and asked whether Plaintiff was "there with anyone." Plaintiff declined to answer. Defendant Hocutt did not order Plaintiff to leave, to lower his signs, to stop speaking, or to remedy any alleged disturbance. Malakoff Police Chief Floyd Thomas also arrived at the scene in or near the same general timeframe as Defendant Hocutt, in a separate marked patrol vehicle. Chief Thomas, like Defendant Hocutt, is a peace officer of the City of Malakoff—a municipality with no geographic jurisdiction over Trinidad City Hall. Chief Thomas remained on scene throughout the events described below.

39. Defendant Hocutt entered Trinidad City Hall. The doors, which had been locked from inside, were opened to permit his entry and then locked again. Defendant Hocutt remained inside Trinidad City Hall for approximately six minutes. On information and belief, during that

time Defendant Hocutt spoke with one or more City employees regarding Plaintiff's earlier visit inside the building and gathered information later used as the asserted predicate for Plaintiff's arrest.

40. About 30 minutes into the Livestream, Defendant Beckham arrived at the scene in a marked Trinidad Police Department patrol vehicle. Defendant Beckham broadcast music through the patrol vehicle's public-address ("PA") system. The volume of the broadcast was sufficient that the music was clearly audible at Plaintiff's location and was captured by Plaintiff's recording equipment. On information and belief, Defendant Beckham's broadcast was undertaken for one or more of the following purposes: to interrupt or drown out Plaintiff's protected speech; to interfere with Plaintiff's recording or broadcast of police activity; to retaliate against Plaintiff for the content or viewpoint of his protected expression; or to cause Plaintiff's Internet broadcast to be subjected to automated copyright-enforcement action.

41. Defendant Hocutt exited Trinidad City Hall. He did not at that time announce that any offense had occurred or that Plaintiff was the subject of any complaint.

42. Defendants McCumsey and Beckham then entered Trinidad City Hall. The doors to the building were unlocked to permit their entry and then again locked. Defendant Hocutt remained outside, at or near his patrol vehicle. Defendants McCumsey and Beckham remained inside for approximately five minutes.

43. While inside Trinidad City Hall, Defendant Beckham pulled the water clerk into an interior office and questioned her with his body-worn camera activated. The water clerk did not report being offended by Plaintiff. She did not request that charges be filed. She did not file a complaint. She told Defendant Beckham only that Plaintiff had taken photographs (lawful conduct), that the City Administrator had locked the door, and that she wished to leave the building

because she did not want the situation to escalate. Defendant Beckham nonetheless directed Plaintiff's arrest minutes later for the asserted offense of having "offended a citizen that is not a public servant."

44. At about 36 minutes into the Livestream, Defendant Beckham exited Trinidad City Hall. Defendant McCumsey followed shortly thereafter. Neither at that moment nor at any point in the approximately six minutes that followed did the Defendant officers move to detain Plaintiff.

45. For several minutes, Defendants McCumsey and Beckham conversed with Plaintiff while Plaintiff continued to stand in front of City Hall holding his signs. During that conversation:

a. Defendant McCumsey requested that Plaintiff identify himself; Plaintiff declined, citing Tex. Penal Code § 38.02. Defendant McCumsey then indicated that the encounter had "became a criminal matter" and identified the asserted offense as "Disorderly conduct," stating in substance that Plaintiff had "offended people inside the city hall." When asked to identify the elements of the offense, Defendant McCumsey articulated them as: (i) being in a public place; (ii) using profane language; and (iii) offending "a citizen that is not a public servant." That recitation omitted the "immediate breach of the peace" element required by Tex. Penal Code § 42.01(a)(1).

b. Plaintiff asked whether he could refrain from using the language to which the officers objected and receive a warning rather than be charged. Defendant McCumsey refused: "No. You've already committed that offense."

c. Plaintiff asked Defendant McCumsey to identify the "non-employee of the government" whom he had allegedly offended. Defendant McCumsey did not identify any such person by name or position.

46. Defendant McCumsey's recitation of the elements of the offense omitted the only element of Tex. Penal Code § 42.01(a)(1) that distinguishes it from a content-based criminalization of speech: the requirement that the language used "by its very utterance tend[] to incite an immediate breach of the peace." In place of that element, Defendant McCumsey substituted the requirement that the speech have "offended" a non-public-servant—a subjective-offense standard that has been foreclosed by the Supreme Court for more than half a century. *Cohen*, 403 U.S. at 21; *Lewis*, 415 U.S. at 134; *Hill*, 482 U.S. at 461-63. In any event, the "private citizen who is not a public servant" inside City Hall whom Defendant McCumsey identified as the supposed victim did not exist: of the four City personnel present on May 12, 2026, three (the City Administrator, the Councilmember, and the Judge) were public servants, and the fourth (the water clerk) was a public employee.

47. About 43 minutes into the Livestream, after Mr. Noles refused to identify himself and challenged the officers' understanding of the law, Defendant Beckham directed Defendant McCumsey to handcuff Plaintiff with the words "Hook him up." Defendant McCumsey complied. Defendant Hocutt was present at the moment of handcuffing, standing immediately behind Plaintiff within arm's reach. Plaintiff was informed that he was under arrest.

48. The total elapsed time between the first officer's arrival at the scene (Defendant Hocutt, at approximately 22:50 of the Livestream) and the handcuffing of Plaintiff (at approximately 43:10 of the Livestream) was approximately twenty minutes and twenty seconds. During those twenty minutes, no act of violence occurred. No breach of peace occurred. No retaliatory altercation occurred. The Defendant officers stood with, conversed with, observed, and investigated Plaintiff for that entire duration—conduct categorically incompatible with the statutory requirement of an "immediate" breach of peace under Tex. Penal Code § 42.01(a)(1).

### E. Defendant Hocutt's Personal Participation in the Seizure

49. Defendant Hocutt, a peace officer of the City of Malakoff (a municipality with no geographic jurisdiction over Trinidad City Hall) was the first peace officer to arrive at the scene of Plaintiff's protected protest and was present throughout the twenty-minute pre-arrest sequence. He personally entered Trinidad City Hall during the investigation, remained inside for approximately six minutes, and on information and belief spoke with City employees, gathered information used as the asserted predicate for Plaintiff's arrest, and relayed that information to Defendants McCumsey and Beckham. He was personally present and within hearing distance when Defendant McCumsey recited the unconstitutional elements of the asserted offense, when Defendant McCumsey denied Plaintiff's request for a warning, and when Defendant Beckham directed Defendant McCumsey to handcuff Plaintiff; Defendant Hocutt neither objected to nor intervened in any portion of this exchange.

50. Defendant Hocutt's conduct went beyond bystander presence. Before the seizure, he personally entered Trinidad City Hall, gathered the information from City employees that became the asserted predicate for the arrest, and relayed that information to the Trinidad officers. At the moment of arrest, he stood within arm's reach of Plaintiff in a position consistent with backup or seizure-support. Following the handcuffing, he took physical custody of the handcuffed Plaintiff and walked him from the public sidewalk to the rear of the patrol vehicle for confinement. Each of these acts is a discrete component of the seizure of a person within the meaning of the Fourth Amendment. Independently, by remaining present and within hearing distance while Defendant McCumsey articulated an unconstitutional offense standard, denied Plaintiff's request for a warning, and accepted Defendant Beckham's direction to handcuff Plaintiff—all without

objection or intervention—Defendant Hocutt failed to fulfill his duty to intervene under clearly established Fifth Circuit law.

### F. The Continued Detention and Chief Gregory's Arrival

51. After being placed in handcuffs, Plaintiff was uncuffed momentarily to allow him to secure his recording equipment. Defendants McCumsey and Beckham then re-cuffed Plaintiff and placed him in the rear of a marked patrol vehicle.

52. Plaintiff remained handcuffed in the rear of the patrol vehicle for approximately thirty to forty minutes while the Defendant officers waited for their chief to show up to give further instructions. During this period of continued custody, the ambient temperature outside was warm. Plaintiff was confined in the back of a marked patrol vehicle, in handcuffs, and was not permitted to leave.

53. Defendant Gregory was off duty and at his residence at the time of Plaintiff's initial seizure. He was summoned to the scene. Upon his arrival, Defendant Gregory was briefed by his officers. He personally decided that Plaintiff would be released on a citation rather than formally magistrated. The arresting officers—Defendants McCumsey and Beckham—had previously informed Plaintiff that the decision whether to take him before a magistrate or to release him on a citation was pending. Defendant Gregory made that decision.

54. Defendant Gregory possessed and routinely used remote access to Trinidad City Hall's interior video-surveillance system, including from his personal residence, and used that access to monitor employee activity and computer screens within the building. That capability was available to Defendant Gregory during the events of May 12, 2026, so he was aware of Plaintiff's presence.

55. Upon arrival and after being briefed, Defendant Gregory had three options open to him: release Plaintiff and decline to issue any charge; release Plaintiff and direct that the citation be voided; or continue the seizure through cite-and-release. The unconstitutional offense standard articulated by Defendant McCumsey on the contemporaneous record had been audibly recorded and was apparent to Defendant Gregory upon his arrival. Defendant Gregory nonetheless elected the third option—continuation of the seizure through cite-and-release—and, in his subsequent statements to journalist Ron Helms, publicly defended the arrest on the same content-based predicate ("the water clerk was offended") that Defendant McCumsey had articulated to Plaintiff. Defendant Gregory knew this predicate was false.

56. Defendant Gregory's decision was an exercise of policymaking authority formally delegated to him by the City of Trinidad's Code of Ordinances. Trinidad Code of Ordinances C§ 32.048 vests in the Chief of Police "supervision over the other members of the Police Department." Section 32.052 provides that "[t]he Chief of Police is responsible for the day to day operation of the Police Department" and that he "may, from time to time, issue orders or specific policy statements for the Police Department." No provision of the Trinidad Code of Ordinances subjects the Chief's day-to-day operational decisions—including individual decisions regarding arrest, magistration, citation, and release—to administrative review by any superior official or body.

### G. The Continued Custody After Chief Gregory's Cite-and-Release Decision

57. After Defendant Gregory's cite-and-release decision was made, Plaintiff remained handcuffed in the rear of the patrol vehicle for at least an additional twenty minutes.

58. Once Defendant Gregory had decided that Plaintiff would not be formally taken to a magistrate, no basis remained for any continued custodial seizure. The cite-and-release decision

necessarily reflected the police judgment that no formal book-and-magistrate process was warranted and concomitantly that continued custodial detention was unnecessary. The Defendant officers' continuation of Plaintiff's cuffed detention beyond that point was an unreasonable seizure under the Fourth Amendment, distinct from the initial arrest.

59. At approximately 2:52 p.m. on May 12, 2026, Plaintiff was issued Citation No. 36889 by Defendant McCumsey (Trinidad PD ID No. 792) for "Disorderly Conduct (Language)."

60. Upon release, Plaintiff immediately departed Trinidad out of well-founded fear of re-arrest in retaliation for continued First Amendment activity.

### H. Chief Gregory's Subsequent Statements to Journalist Ron Helms

61. While Plaintiff was handcuffed in the back of the patrol vehicle, journalist Ron Helms arrived at the scene to investigate Plaintiff's arrest. Mr. Helms conducted a live Internet broadcast of his conversations with Trinidad Police Department personnel, including Defendant Gregory and Defendant Beckham (the "Helms Recording").

62. In the Helms Recording, Defendant Gregory stated, in substance, that the basis for Plaintiff's arrest was that Plaintiff had "walked in, started yelling and cussing and screaming" inside Trinidad City Hall, and the City's water clerk was "offended" by Plaintiff's words.

63. Defendant Beckham, when asked by Mr. Helms whether saying "fuck you" to a person who reported being offended would result in arrest, confirmed in substance that an arrest could follow upon the filing of such a complaint.

64. These statements—taken together with Defendant McCumsey's contemporaneous recitation of the asserted elements of the offense as including "offended a citizen that is not a public servant" and Chief Gregory's published characterization of community criticism as "misinformation" and "fake news"—establish that the legal standard applied by the Defendant

officers and Defendant Gregory was that a citizen could be arrested for words that caused another person subjective offense. That is not the standard under Tex. Penal Code § 42.01(a)(1), and it is not a constitutional standard for arrest under any circumstances.

## I. The Absence of Probable Cause for Disorderly Conduct

65. There was no probable cause to arrest Plaintiff for any offense, for at least the following independent reasons:

a. **First**, the speech for which Plaintiff was arrested—the words on his protest signs, his oral commentary during his outdoor protest, and his single use of profanity in conversation with a City employee inside City Hall—was constitutionally protected. Arrest for the content of constitutionally protected speech is per se without probable cause, and offense at protected speech has never been a constitutional basis for arrest.

b. **Second**, the statutory element of "immediate breach of the peace" was not satisfied as a matter of law. Defendant officers stood with Plaintiff for approximately twenty minutes before placing him in handcuffs. They conversed with him, went inside City Hall, came back outside, played music, and took notes. The deliberative pace and duration of the Defendant officers' investigation conclusively forecloses any claim that an "immediate" breach of peace was at issue.

c. **Third**, the asserted complainant did not exist. At the time of arrest, the Defendant officers could identify no person whose putative offense at Plaintiff's words constituted the basis for arrest; the asserted complainant was described only as "a citizen that is not a public servant" inside City

Hall. To the extent the officers contend they relied on a citizen complaint, any such reliance was objectively unreasonable: a citizen's report of being "offended" by another's profane speech in a public place does not, as a matter of clearly established law, constitute probable cause under § 42.01(a)(1). No such complaint existed. The City's water clerk—the person Defendant Gregory publicly identified as the supposed victim—was not offended, was not threatened, did not request police assistance, and did not file any complaint, verbal or written, against Plaintiff on May 12, 2026. On May 15, 2026, on a Trinidad Police Department Voluntary Statement form provided by Defendant McCumsey, the water clerk submitted to Defendant McCumsey a signed statement that expressly stated, in capital letters and underlined, that she was "NEVER OFFENDED" by any statements or actions of Plaintiff. Defendant McCumsey received and accepted that statement. The citation has not been dismissed. In addition, on May 15, 2026, the water clerk submitted to the Trinidad Municipal Court a separate written statement requesting dismissal of the citation on the explicit ground that she had "NOT" been offended by Plaintiff's conduct.

**J. The City's Termination of Key Witnesses**

66. On May 12, 2026, immediately after Plaintiff's encounter inside City Hall, the City Administrator directed the water clerk to leave the premises. The water clerk did not ask to leave. She was escorted from inside Trinidad City Hall to a private vehicle by Malakoff Police Chief Floyd Thomas and driven home by Jerry Bannister, the son of a sitting Trinidad City Councilmember.

67. On May 13, 2026, Trinidad City Hall was closed to the public without prior notice to staff. The water clerk learned of the closure only after being told not to report.

68. On May 14, 2026, the water clerk approached the Trinidad Municipal Judge to discuss a witness statement seeking dismissal of Plaintiff's citation. On May 15, 2026, the water clerk drafted, signed, and submitted two written statements: (a) a statement to the Trinidad Municipal Judge requesting dismissal of Plaintiff's citation on the ground that she had never been offended, and (b) a sworn police statement to Defendant McCumsey stating, with the words "NEVER OFFENDED" capitalized and underlined, that she had not been offended by Plaintiff's conduct. Both statements were drafted and printed on the water clerk's City-owned work computer.

69. On Monday, May 18, 2026—the next business day after the water clerk's police statement disclaiming offense was submitted—the City Administrator summarily terminated the water clerk, stating only that "the city has decided to go in a different direction." The water clerk had no prior discipline of any kind, had received no written or verbal counseling, and had recently received an unsolicited statement from the City Administrator that the Administrator "could not do this without" her. No written termination letter was provided. No severance was offered. No notice was given.

70. In the same general timeframe as the water clerk's termination, the Trinidad Municipal Court Judge was removed from her position. She was a percipient witness to Plaintiff's inside-City-Hall interaction on May 12, 2026, the judicial officer who summoned police to the scene on that date, and the judicial officer to whom the water clerk submitted her May 15, 2026 dismissal-request statement.

71. The Mayor of Trinidad was not informed of, and did not authorize, the water clerk's termination. When the water clerk informed the Mayor of her termination by telephone after the fact, the Mayor was unaware that any termination had occurred.

72. The City's termination of the water clerk on May 18, 2026, and the City's separation of the Trinidad Municipal Judge, are consistent with—and further evidence of—the City of Trinidad's custom and practice of retaliating against citizens, employees, and officials who publicly or formally contradict the Trinidad Police Department's enforcement narrative on matters of public concern.

## V. CLAIMS FOR RELIEF

### COUNT ONE
### 42 U.S.C. § 1983—Fourth Amendment—Unreasonable Seizure (Initial Arrest) Against Defendants McCumsey, Beckham, Gregory, and Hocutt

73. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

74. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.

75. On May 12, 2026, Defendants Beckham and McCumsey effected an arrest of Plaintiff by placing him in handcuffs, informing him that he was under arrest, and placing him in the rear of a marked patrol vehicle. The seizure was a full custodial arrest, not a brief investigative detention.

76. There was no probable cause to arrest Plaintiff. The asserted basis for arrest—Plaintiff's protected speech inside and outside Trinidad City Hall—did not constitute an offense under Tex. Penal Code § 42.01(a)(1) or any other statute.

77. Defendant Gregory, although not present at the initial seizure, became personally involved in the continuing seizure when he arrived on scene, was briefed on the basis for the seizure, and elected—under his policymaking authority—to continue the seizure through cite-and-release rather than terminate it.

78. Defendant Hocutt was personally involved in the seizure through his initial investigation inside Trinidad City Hall, his on-information-and-belief gathering of information used as the asserted predicate for arrest, his continuous presence throughout the twenty-minute pre-arrest sequence, his arm's-reach position behind Plaintiff at the moment of handcuffing, and—most directly—his physical escort of the handcuffed Plaintiff from the public sidewalk toward the rear of the marked Trinidad Police Department patrol vehicle.

79. At the time of the events alleged, the law was clearly established that police officers may not arrest a citizen on the basis of profane or insulting speech directed at government, *Cohen v. California*, 403 U.S. 15 (1971); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974); *City of Houston v. Hill*, 482 U.S. 451 (1987); or arrest a citizen without probable cause, *Devenpeck v. Alford*, 543 U.S. 146 (2004).

80. Each Defendant officer's conduct was objectively unreasonable in light of clearly established law. No reasonable officer in their position could have believed that the seizure of Plaintiff for the content of his protected speech, in the circumstances described, was lawful—particularly where Defendant McCumsey articulated an unconstitutional offense standard on the contemporaneous record.

81. As a direct and proximate result of Defendants' unlawful seizure of Plaintiff, he suffered injuries including deprivation of liberty, physical discomfort, mental and emotional

distress, loss of professional time and opportunity, damage to reputation, and the chilling of his constitutional rights.

**COUNT TWO**
**42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Prolonged Seizure**
**(Continued Custody After Cite-and-Release Decision)**
**Against Defendants McCumsey, Beckham, and Gregory**

82. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

83. Once Defendant Gregory made the decision that Plaintiff would be released on a citation rather than formally taken to a magistrate, no probable cause for any continued custodial seizure remained. The cite-and-release decision reflected the police judgment that no formal book-and-magistrate process was warranted and concomitantly that continued custodial restraint was unnecessary.

84. Despite that decision, Defendants McCumsey and Beckham continued to detain Plaintiff, handcuffed in the rear of a patrol vehicle, for at least twenty additional minutes. They did so under the direct supervision and authority of Defendant Gregory, who was on scene throughout that period.

85. Continued cuffed detention of a citizen for whom the police have elected cite-and-release, in the absence of any independent justification, is an unreasonable seizure under the Fourth Amendment. The constitutional rule that the scope and duration of a seizure cannot exceed its lawful predicate was clearly established at the time of the events alleged.

86. As a direct and proximate result of the continued unlawful seizure, Plaintiff suffered additional injuries.

## COUNT THREE

**42 U.S.C. § 1983 — First Amendment — Retaliation and Content/Viewpoint Discrimination for Protected Speech Against Defendants McCumsey, Beckham, Gregory, and Hocutt**

87. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

88. Plaintiff engaged in constitutionally protected activity, including: (a) entering Trinidad City Hall to investigate matters of public concern; (b) standing on a public sidewalk in front of City Hall; (c) displaying signs that constitute political and social commentary; (d) live-broadcasting his observations on the Internet; (e) speaking in a manner critical of the Trinidad Police Department and local government; and (f) traveling to Trinidad to protest the state-jail-felony arrest of the Water-Post Arrestee and the Chief's public statement defending that arrest.

89. Defendants' adverse actions—including the arrest, the prolonged custodial detention, the issuance of the citation, and the broadcast of music at Plaintiff during his protected expression—were each injuries that would chill a person of ordinary firmness from continuing to engage in protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

90. Defendants' adverse actions were substantially motivated by the content and viewpoint of Plaintiff's expression. The Chief's Facebook Statement—published in Defendant Gregory's official capacity on the Trinidad Police Department's official Facebook page in the days immediately before Plaintiff's arrest—itself characterizes critics of the Department's enforcement actions as enemies of the community ("contributing to the problem," "fake news," "fearmongering"). The contemporaneous statements of Defendant McCumsey on scene (that Plaintiff had "offended" a non-public-servant) and Defendant Gregory's subsequent statements to Mr. Helms (that the basis was the water clerk being "offended" and that Plaintiff had been arrested

for his words) establish that the substantial motivating cause was the content and viewpoint of Plaintiff's expression.

91. Defendant Beckham's broadcast of music through his patrol vehicle's PA system, audible at Plaintiff's location during his protected First Amendment expression, was conduct intended or reasonably calculated to interfere with Plaintiff's protected expression, recording, and Internet broadcast, and constituted content- and viewpoint-based interference with First Amendment activity. The arrest of Plaintiff for displaying signs reading *Fuck Bad Cops* and *Shit Is Fucked Up And Stuff*, and for speech critical of local government, while citizens engaging in pro-police or pro-municipal speech were not arrested for comparable use of profanity in public, constitutes viewpoint-based law enforcement in violation of the First Amendment.

92. Although *Nieves v. Bartlett*, 587 U.S. 391 (2019), ordinarily requires a plaintiff bringing a retaliatory-arrest claim to plead the absence of probable cause, Plaintiff satisfies that requirement as set forth in Count One. In the alternative, the *Nieves* exception applies. There is objective evidence that similarly situated individuals—namely, persons who used profanity in public in Trinidad without engaging in critical-of-government speech—have not been arrested under § 42.01(a)(1). Defendant Beckham's own statement in the Helms Recording—that arrest under these circumstances requires that someone "file a complaint"—confirms that the Trinidad Police Department's enforcement of § 42.01(a)(1) is driven by complaint-based, content-discriminatory factors rather than by neutral application of statutory criteria. *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam).

93. The right to be free from First Amendment-retaliatory arrest and from content- or viewpoint-based law enforcement was clearly established at the time of the events alleged. *Hartman v. Moore*, 547 U.S. 250 (2006); *Keenan*, 290 F.3d at 258; *Hill*, 482 U.S. at 461-63.

94. As a direct and proximate result of Defendants' retaliatory and viewpoint-discriminatory conduct, Plaintiff suffered the injuries described in this Complaint, including the chilling effect of having his speech criminalized.

## COUNT FOUR
## 42 U.S.C. § 1983—Municipal Liability
## Against the City of Trinidad, Texas

95. Plaintiff incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

96. A municipality is liable under 42 U.S.C. § 1983 when execution of a government's policy or custom—whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy—inflicts the injury. Plaintiff pleads the following independent and alternative theories. Any one, if proved, suffices.

### *A. Final Policymaker—Chief Gregory's Decision*

97. The City of Trinidad has, by its Code of Ordinances, formally delegated to the Chief of Police final authority over the operational decisions of the Police Department. Trinidad Code of Ordinances § 32.048 vests "supervision over the other members of the Police Department" in the Chief. Section 32.052 makes the Chief "responsible for the day to day operation of the Police Department" and authorizes him to "issue orders or specific policy statements." Although § 32.053 provides that general departmental policies are approved by the City Council, no provision of the Code subjects individual operational decisions—including the decision whether to arrest, magistrate, or cite a particular citizen—to administrative review. The Chief of Police is therefore the final policymaker for the City of Trinidad with respect to operational arrest, detention, and release decisions, and with respect to the operation of the Department's official social-media

presence. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

98. On May 12, 2026, Defendant Gregory exercised that final policymaking authority by personally deciding that Plaintiff would be cited and released for an offense for which there was no probable cause. He had previously exercised that authority by causing the Department to seek a Facebook search warrant for the Water-Post Arrestee, by directing the felony arrest of the Water-Post Arrestee, and by publishing the Chief's Facebook Statement defending that arrest in his official capacity. Under *Pembaur*, the City of Trinidad is liable for the constitutional violations alleged.

99. In the alternative, the City of Trinidad delegated to the City Administrator final policymaking authority over personnel decisions affecting non-police municipal employees, including hiring, discipline, and termination. On information and belief, no provision of the Trinidad Code of Ordinances subjects the City Administrator's individual personnel decisions to administrative review by the City Council, the Mayor, or any superior official prior to taking effect.

100. On May 18, 2026, the City Administrator exercised that final policymaking authority by terminating the water clerk in temporal proximity to and after the water clerk's protected statements disclaiming the factual predicate the Trinidad Police Department had publicly asserted for Plaintiff's arrest. That decision was made without notice to or authorization from the Mayor, and was, on information and belief, ratified by the City Council through its subsequent inaction.

### *B. Ratification by the City Council*

101. In the alternative, the City of Trinidad is liable through ratification by its City Council—the formal policymaker under § 32.053. Before May 12, 2026, the Trinidad Police

Department had effected the state-jail-felony arrest of the Water-Post Arrestee, the arrest of Mr. Helms on a criminal trespass theory, and Chief Gregory's publication of the Chief's Facebook Statement on the Department's official page. On information and belief, the City Council was aware of these matters at one or more regular meetings, and took no action to investigate, correct, discipline, or change the Police Department's practices. The Council's inaction in the face of a pattern of First Amendment-retaliatory law enforcement constitutes ratification.

### *C. Custom or Practice of First Amendment Retaliation*

102. Independent of any formal policymaker designation, the City of Trinidad has developed a custom or practice of First Amendment-retaliatory law enforcement directed at critics of the City's water system and other matters of local-government concern. The custom is evidenced by:

a. The Trinidad Police Department's state-jail-felony arrest of the Water-Post Arrestee under Tex. Penal Code § 42.06 for Facebook speech soliciting community information about water-related health issues, followed by Chief Gregory's official Facebook Statement defending that arrest and characterizing community critics as enemies of the community ("misinformation," "false narratives," "fearmongering," "fake news," "contributing to the problem");

b. The arrest of journalist Ron Helms for investigative journalism activities at Trinidad City Hall, on a criminal trespass theory and with an $8,000 bond;

c. The multi-agency, multi-officer response to Plaintiff's peaceful protest at City Hall—including Defendant Hocutt and Malakoff Police Chief Floyd Thomas, neither of whom held geographic jurisdiction over Trinidad City

Hall—reportedly responding at a high rate of speed, Defendant Beckham's use of his patrol vehicle's PA system to broadcast music at Plaintiff during his protected expression, and Plaintiff's arrest on a charge predicated on the same content-based, offense-as-element standard that Defendant McCumsey articulated to Plaintiff; and

d. The City's May 2026 separation of two non-police municipal personnel who had material information contradicting the Trinidad Police Department's stated basis for Plaintiff's arrest—the water clerk and the Trinidad Municipal Judge—in temporal proximity to and after the water clerk's protected "<u>NEVER OFFENDED</u>" statement.

### *D. Failure to Train (*Canton/Connick*)*

103. Under *City of Canton v. Harris*, 489 U.S. 378 (1989), a municipality is liable where its failure to train its officers reflects deliberate indifference to the rights of those with whom the officers come into contact, including where the need for training is so obvious that the policymakers can reasonably be said to have been deliberately indifferent. *Connick v. Thompson*, 563 U.S. 51 (2011), recognizes that such single-incident liability is available where the need for training is patent.

104. The need for training Trinidad police officers on First Amendment limits on arrest authority is patently obvious. Police officers in any municipality predictably encounter citizens exercising First Amendment rights—recording, protesting, criticizing government, journalism. The need was particularly obvious in Trinidad in the spring of 2026, when the Department had effected at least two First Amendment-retaliatory arrests within weeks and the Chief had publicly characterized public criticism of the Department as the enemy of "truth." Despite this obvious

need, none of the four Defendant officers has ever received any training on First Amendment limits on arrest authority. The City's failure to train was a moving force behind the constitutional violations alleged. Officers trained on the elementary First Amendment limits on arrest authority would not have effected the seizures alleged here and would not have articulated the unconstitutional offense standard captured on the contemporaneous record.

### *E. Deliberate Indifference in Hiring (***Bryan County***)*

105. Under *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997), a municipality may be liable for hiring an officer where the constitutional violation was a plainly obvious consequence of the hiring decision. Each of the three Defendant Trinidad PD officers exhibits an unusually transient employment history. On information and belief, the City of Trinidad failed to meaningfully investigate the reasons for the officers' departures from prior agencies—including by failure to obtain or review F-5 separation reports under Tex. Occ. Code § 1701.453, by failure to interview prior supervisors, and by failure to consider the pattern of short tenures as a hiring risk factor. The City's failure to investigate was deliberately indifferent to the rights of citizens with whom the Defendant officers would predictably interact.

### *F. Failure to Supervise and Discipline*

106. The City of Trinidad and its policymakers failed to discipline or supervise the Defendant Trinidad PD officers for the conduct alleged. The City's response to information contradicting the Department's stated basis for Plaintiff's arrest has been retaliation against the source of the contradiction rather than investigation, discipline, or correction.

## VI. DAMAGES

107. As a direct and proximate result of the conduct of Defendants set forth herein, Plaintiff has suffered, and continues to suffer:

(a) Deprivation of liberty during the arrest and prolonged custody;

(b) Physical discomfort and pain from handcuffing and prolonged confinement in a warm patrol vehicle;

(c) Mental anguish, emotional distress, anxiety, humiliation, and fear of further arrest;

(d) Chilling of First Amendment rights, including curtailment of Plaintiff's ongoing journalism and protest activity in Trinidad;

(e) Loss of professional time, opportunity, and reputation; and

(f) The pendency of an unresolved criminal citation requiring Plaintiff to expend additional time and resources to defend himself in the Trinidad Municipal Court.

108. Plaintiff is entitled to compensatory damages in an amount to be proved at trial. The individual Defendants' conduct was intentional, knowing, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against the individual Defendants in an amount to be proved at trial. Plaintiff is also entitled to a reasonable attorneys' fee and costs of court under 42 U.S.C. § 1988.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Winston Wesley Noles respectfully requests that, upon final hearing or trial of this matter, this Court enter judgment in his favor and against Defendants as follows:

A. Declaratory relief that Defendants' conduct violated Plaintiff's First and Fourth Amendment rights and that the City of Trinidad's custom of First Amendment-retaliatory law enforcement is unconstitutional;

B. Injunctive relief prohibiting Defendants from enforcing Tex. Penal Code § 42.01 against constitutionally protected criticism of government;

C. Nominal and compensatory damages in amounts to be proved at trial;

D. Punitive damages against the individual defendants in amounts to be proved at trial;

E. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

F. Pre- and post-judgment interest at the maximum rate allowed by law; and

G. Such other relief as the Court deems just.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable, pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

Respectfully submitted,

**GRABLE PLLC**

*/s/ Brandon J. Grable*
**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@grable.law
12451 Starcrest Drive, Ste 206
San Antonio, Texas 78216
Telephone: (210) 963-5297
Facsimile: (726) 215-4765
**Counsel for Plaintiff**